«ANDERSON, J„
delivered the opinion of the court.
The contracts and settlements which are drawn in question by this suit, and sought to be set aside, were entered into by the board of public works of Virginia, on behalf of the Commonwealth (partyof thefirstpart) with Bradley T. Johnson, Neilson Poe and John P. Poe, the appellees (parties of the second part), the board claiming to be specially clothed with power and authority for the purpose, by a joint resolution of the general assembly of Virginia, of the 16th of February. 1867, which is recited in the contract, which was made on the 27th of Feb *451 ruary of the same year, and which is supplemented by another contract of the 5th of March following.
Soon after the contracts were concluded, the appellants proceeded with their execution which by the terms thereof, was to be at their expense. They were actively engaged in its performance from February 27th, or March 5, 1867, until January, 1873, when their final settlement was made with the board — a period of nearly six years. By that settlement their performance of the contracts was acknowledgedandapproved by the board of public works, and the Commonwealth was released from any further obligation to them under said contracts. No objection was made to the contracts, or to their fulfillment by any one, so far as the record shows, whilst they were engaged in their performance, although the general assembly which passed the joint resolution was in session at the time the contracts were made, and must be presumed to have been cognizant of them. It was a public transaction. The contracts were filed with the public records, and were open to the inspection of any member of that assembly, or of the succeeding assemblies which were annually in session, whilst they were engaged in their performance; *or by any person who might have felt sufficient interest to look into them. It was a matter in which the public interest was deeply concerned, which had been brought to the attention of the general assembly, and the board was acting under its order. And after the services had been rendered by the appellees, and after they had made a final settlement with the board of public works, and had paid to the sinking fund under its directions the balance due the Commonwealth from their collections, as it had been finally adjusted between them and the said board, the whole transaction was reviewed by a joint committee of the general assembly, under whose joint resolution the board of public works had acted in the premises. who, upon their investigation, came unanimously to the following conclusions:
“First. That the contracts made by the board of public works with the counsel were authorized by law, and were judicious and advantageous to the State.
“Second. That they have been executed by counsel with zeal, energy, ability and success; and
“Third. That the final adjustment and settlement was strictly in accordance with the agreement and contracts made and entered into.”
Which they reported to the general assembly. The report is signed by H. W. Thomas (Judge Thomas'), chairman senate committee; T. G. Popham, chairman house committee, and Robert L,. Montague (former lieutenant-governor, afterwards an eminent judge of the circuit court).
Whether at that, or a subsequent session of the general assembly, does not appear, on motion of a member of the house of delegates, prompted, as would seem from the preamble, by publications in some of the newspapers, a series of resolutions were adopted, calling for information to be reported" to the house, from *the board of public works; from James Neeson, attorney for the State; and from the auditor of public accounts; and a committee of five was appointed, afterwards increased to seven, of which the mover was chairman, to examine all the statements and exhibits which may be furnished in response to said resolutions, and to inquire into all matters pertaining to said transactions, and report the facts to the house, with such recommendations as they may deem proper.
It appears that only six of the committee, including the chairman, participated in this investigation. The' report Óf the majority, approved by four of the committee, substantially affirms the unanimous conclusions of the joint committee, which had previously investigated the transactions, under a joint resolution of both houses of the general assembly. The chairman made a minority report, in which he claims to have discovered, and reasons ingeniously to show, that the board of public works were not invested with power to make the contract they made with the appellees, and assails the transactions on other grounds, and recommends the adoption of a joint resolution to the effect, that the governor be authorized and instructed, to employ able counsel to examine into all matters pertaining to the contracts made by the board of public works with the appellees, on the 27th of February, and 5th of March. 1867, and their settlements under said contracts; and if in their opinion there are proper grounds for so doing, the governor shall cause legal proceedings to be instituted by the attorney-general, in connection 'with other able counsel, to recover whatever balance may be due the State on account of collections made by her attorneys, the appellees, from the Chesapeake and Ohio canal company. There is a special concurrence by one of the committee (William F. Gordon) with the chairman in the facts as set forth *by him, and his construction of the resolution of the general assembly of February 26, 1867, and in the resolution recommended by him for the adoption of the general assembly. He does not express further concurrence in the minority report. Two of the majority of the committee say in substance that they prefer the construction given to the joint resolution of February 26, 1867, by the majority-report, but not being confident of its correctness, and being unwilling to conclude further inquiry into the matter by competent counsel, they assent to the recommendation of the minority report.
It seems that the said resolution was adopted only by the house of delegates, and not as a joint resolution; and the governor in obedience to its requirement, appointed able counsel to investigate and report their ©pinion on the matters referred to in the resolution. In their report they set out the resolution as the foundation of their authority, and describe it as a “resolution of the hpuse cf delegates, adopted 89th of March, 1877.” The counsel-employed, we doubt not, *452 honestly formed their opinion upon the investigation of the case, which they endeavored to maintain in an elaborate report, and as the result of that opinion, they advised the institution of suit. And one of them, James G. Field, having become the attorney-general of the State, the same counsel were directed by the governor, in obedience to the resolution aforesaid of the house of delegates, to institute this suit in the name and on behalf of the Commonwealth. The case was thoroughly and laboriously investigated in the circuit court of Richmond, and the learned judge thereof, in a well-considered, and able opinion, dismissed the plaintiff’s bill; and the case is brought here on an appeal from that decree.
*The first question is, and it is the material question in the case, Did the board of public works, in entering into this contract with the appellees, exceed their powers? They professed to act under and by authority of the joint resolution of the 26th of February, 1867, before referred to, which is as follows:
"Be it resolved by the general assembly, That the board of public works be and they are hereby authorized and directed to adopt such measures as in their judgment may be necessary and advisable to realize the preferred liens of the State upon the tolls and revenues of the Chesapeake and Ohio canal company, and for that purpose to contract with counsel for the enforcement of said liens, in concert with other holders of similar liens: provided, however, that the compensation of such counsel shall be contingent only, and shall be paid by said board only out of the proceeds to be realized from the proceedings, or the debts and liens secured thereby.”
To “realize the preferred liens of the State,” evidently means to give effect to them. And the board is invested with full powers to adopt such measures as in their judgment may be necessary and advisable for that purpose: and it is authorized to employ counsel for their enforcement. It is contended that this language gave power to the board to provide only for the collection of debts due from the company to the State, and not to provide for the security of the State as to her liability as guarantor for debts due others. The duty imposed on the board, was not limited to the collection of debts. It needed no special authority for that purpose. It could have placed the claims of the State in the hands of counsel for suit or collection, without any special authority from the legislature. But a suit or judgment against the canal company, whose property and resources were all covered by mortgages !|!for more than could be realized by a sale, could have availed nothing to the State of Virginia. An execution against the company, would have been utterly unavailing to obtain satisfaction of the debts it owed the St-ate. And the resolution does not even direct that suit shall be brought for the debts due the State. It instructs the board to adopt such measures, as in its judgment, may be necessary and advisable, (it is not restricted as to the measures it may adopt: that is left entirely to its discretion), “to realize” that is to give effect to the preferred liens of the State, upon the revenues and tolls of the company. Debts are not mentioned- — -showing that the legislature did not mean to restrict the action of the board to the recovery of debts due the State, for which she had a lien, but also to secure the State from loss, by reason of her liability for debts due from the company to others, for which the State was liable, by giving effect to the liens which it was believed she had for her indemnity. So that by using the term liens, instead of debts, the instruction was more comprehensive, and imposed the duty on the board to take measures, not only to realize the debts due from the company to the State, and to enforce and give effect to the liens of the State for that purpose, but also to secure the State from loss on account of debts due by the company to others, for which the State was liable as guarantee, by giving effect to liens which the State was believed to have for her indemnity.
We think the instructions to the board, imposed the duty to adopt measures both for the security of the State for what was due her from the company, and indemnity for debts due by the company to others, for which the State was liable; and that it is expressed by the use of the term “liens” which would not have been, if the terms debts due the State had been employed, instead -of “liens of the State.”
*But we are told that the State had no liens for her protection as guarantor, and therefore that the general assembly, by the terms “to realize the preferred liens of the State,” could not have had reference to the State’s guaranties. The truth is the State had no liens except as guarantor. but for the bond of $13,500, assigned to her by Seldon, Withers & Co.
There is no doubt that the canal bonds, which were guaranteed by the State, were secured by a preferred lien upon the net tolls and revenues of the company, and that it was upon the faith of that security, that Virginia guaranteed them. There is also no doubt that when Virginia guaranteed them, she became entitled to the benefit of that security for her indemnity. There ought to be as little doubt, that when the general assembly by its joint.resolution aforesaid, instructed the board of public works to take measures to realize, that is, to give effect to, the liens of Virginia on the revenues of the company, it meant to save Virginia from loss by her guaranty of those bonds, in the only way by which it could be done, by giving effect to the liens which Virginia had a right to for her indemnity as guarantor. They were liens which Virginia had a right to look to for her protection, and in that sense they were her liens.
In order to support this construction it is not necessary that the language used in the resolution should be technically correct, or that they were absolutely and unqualifiedly Virginia’s liens. If she had a right to rely on them, and did rely on them, for her protec *453 tion and indemnity, when she contracted to guarantee the bonds, they are embraced in the instructions, though she could not actually enforce the right, until she had paid the debt. Therightattached immediatelyupon the execution of the guaranty, and the general assembly was warranted in characterizing it as a lien of the *State. The using the term “liens,” instead of the term debts, shows that the resolution means more than debts. And it implies that, in the opinion of the general assembly, there were other interests of the State, besides the debts due from the canal company, which required attention, all of which might be secured, by realizing or giving effect to, her preferred liens.
But why should it be thought that the legislature intended to restrict the board to measures, only for the recovery of debts due the State from the company? The language of the resolution, we have seen, does not require such a construction.
The company had issued coupon bonds to the amount of $1,699,500, for completing the construction of the canal to Cumberland, which are called constructionbonds — andhad issued similiar bonds to the amount of $200,-000, for the repair of the canal from dam No. 6. to Georgetown, a distance of one hundred and twenty-three miles, called repair bonds; and had secured them by a mortgage on the revenues and tolls of the canal — Maryland consenting that it should have precedence as to the tolls and revenues, over a prior lien which she held on all the property of the canal company, as well as on its tolls and revenues, amounting on the tst of January, 1867, to $5,968,586.94. Virginia had guaranteed $300,000 of the construction bonds, and the whole of the repair bonds. The company had been in default in the payment of the almost entire interest, from the time of the completion of the construction to Cumberland, and the repairs from dam No. 6, to Georgetown, to the 1st of January, 1867 — a period of sixteen or seventeen years. Selden, Withers & Co. had paid the coupons on the construction bonds, which fell due on the 1st of July, 1851, and 1st of January and 1st of July, 1852, amounting to $140,000 which they surrendered to the company, and took its *bonds therefor, which are called special bonds. They also held a construction bond for $13,500, with coupons on it; and being indebted to Virginia, they assigned said bonds to her as collaterals. These constituted one of the debts claimed by Virginia against the canal company. It was at least questionable whether the special bonds for $140,000 were secured by the mortgage lien, and the court of appeals of Maryland afterwards held, that they were not, and were not a specific charge upon the property of the company, or its revenues. Being postponed therefore until after the payment of all the other debts due by the company, for which all its property and revenues were specially charged, which were augmented every year by accumulating. interest, and which there was no probability could ever be paid, this debt of $140,000, under that decision, was absolutely worthless.
Virginia as guarantor, had paid all the coupons both on the construction and repair bonds, which had accrued subsequent to 1st of July, 1852, to the 1st of January, 1865, which had been presented to her for payment, amounting to about $300,000 — $35,400 of which the canal company had funded, and given to the State certificates therefor. Virginia claimed that the company was indebted to her for the whole amount, and interest ujion the coupons from the date of their maturity respectively. But there was a difficulty in the enforcement of her claim for the coupons which had not been funded inasmuch as they had been lost, or destroyed or stolen and could not be produced by the State. The court aforesaid, after much litigation, established the claim of Virginia to the lost coupons, upon the evidence which the ap-pellees, as counsel of the State, had collected and adduced; but required that the State should give indemnity to the canal company against loss, should any of the coupons ^allowed, be afterwards produced by bona fide holders, and recovered, and the appellees entered into a personal obligation to the company for its indemnity in the amount of $175,000.
Another difficulty they had to encounter. The State as guarantor had paid no interest since 1st of January. 1865, and it was earnestly contended by the holders of the bonds, and other coupons, that the State being in default as guarantor.shouldbepostponedun-til their coupons were satisfied. The court sustained them in this position, as to the repair bonds; which was no serious loss or disadvantage, however, to the State, as under the reformed administration of the canal, which had been introduced mainly by the exertions of the appellees, the canal company by the year 1870 had paid off the whole of the repair bonds, with the interest on them, which of course included the claim of Virginia, for the coupons which she had paid on those bonds. Buf the contention of the holders of the construction bonds, and the coupons on them, for the postponement of Virginia as defaulting guarantor, if it had been successful, would have been disastrous to her, as $18,000 of those bonds guaranteed by Virginia, did not mature until 1882. $131,-500 of them not until 1883, and the remainder $150,500 not until 1884, and Virginia would have received nothing for the coupons which she had paid, until the whole of them, with the- coupons past due and accruing in the hands of other parties, were fully satisfied, nor any interest on what she had paid, as under the rulings of the same court, the lien did not extend to the interest on the coupons which had accrued, then amounting to as much as the principal, or which thereafter accrued on the coupons which she had paid. But the court held that as to the construction bonds Virginia should be paid pasfi passu with the other holders of coupons. This in connection with *the decision that the repair bonds were entitled to precedence in payment, over the construction bonds, was a *454 great success for Virginia, and for her counsel, as their compensation was wholly contingent upon their recovery, and was to be paid out of what they recovered.
These were the debts claimed by Virginia at the date of the joint resolution aforesaid. As to a large portion of the claim it was at least doubtlul whether it was covered by the lien; and if not, it was not recoverable. It was due from a company that might well be regarded hopelessly insolvent as to all debts which were outside its mortgages. It was afterwards settled judicially by the final decision of the supreme court of Maryland, that this portion of the Virginia debt, was not entitled to the benefit o'f the lien. It was therefore worthless.
The coupons and bonds which were after-wards adjudged to be due the State, and entitled to the benefit of the lien, seem to have had but little value at that time. It is testified by Mr. Joseph Bryan, an eminent lawyer, who had thoroughly investigated the condition of the company in another case, that they were worth little or nothing at that time. And it seems that in 1865 bonds of the company secured by the first lien with fourteen years of interest upon them, were appraised at ten cents in the dollar. But the State was guarantor for $300,000 of repair bonds, with the coupons on them which matured on the 1st of July, 1869, which was rapidly approaching, and for $300,000 of the construction bonds, and the coupons which were past due, and had not been paid, and for those which were semi-annually accruing until the maturity of the bonds, as before mentioned. These she was bound to pay, according to their face value — dollar for dollar. A general assembly which recognized the obligation of the *State’s contracts, and its duty to provide for them, as the assembly of 1867 did, would naturally have regarded it as more important to the State to be relieved from its liabilities as guarantor for these large debts, than to secure the payment of debts which were then of such inconsiderable value. They must have regarded the stock of $350,000, which the State had subscribed to the capital of the company, as sunk — a total loss, and would have given themselves no concern in reference thereto. The debts due the state, so far as the net revenues of the .company were pledged for their payment, pari passu with a greatly larger debt due others, they would not have regarded as wholly and hopelessly lost, though for seventeen years the State, and the other creditors had derived nothing from the revenues of the company, but they would have regarded it as much worse for the State to have to pay the large debt, dollar for dollar, which she had solemnly guaranteed, with the coupons past due. and those accruing, and for the payment of which, as doubtless was believed by that general assembly, her faith and honor, were sacredly pledged, than the loss of the debt then due the State, whose market value was so inconsiderable. And thus as the subject had been brought to the attention of the general assembly, it was their duty, not only to require that measures should be taken, to secure the debts due the State as far as practicable, but more especially, to provide for her indemnity against loss, by reason of her guaranties. It would seem unreasonable, therefore, that the general assembly of 1867, in requiring the board of public works to take action on the subject, would have entirely ignored the heavy liabilities of the State by reason of her guaranties, and restricted the action of the board, only to the collection of the debts due the State.
*But we are told that in securing the debts due the State, she would be necessarily indemnified against loss as guarantor. That is true, as to that portion of the debt guaranteed by the State, which had been paid by her. But if that could be secured or collected in any way, which would not include the guaranteed debt, which had not been paid, the State would not be guaranteed as to the latter — and it is to be observed that the resolution does not prescribe any mode for the board to adopt, but leaves it entirely to its discretion.
But if the services of counsel contracted for by the board, were necessary and advisable, in its judgment, to secure the payment of debts due the State, the board did not, in any view of the case, exceed its authority, in contracting for those services, because they would result in indemnity to the State as guarantor, and the contract is not ultra vires on that ground. But the board gave the counsel a contingent per centum, on the sums guaranteed by the State, as well as the debts secured; did it exceed its powers in that?
The restriction that the counsel should be paid their compensation out of the debts due from the company to the State, secured by their proceedings, did not limit the board in ascertaining and fixing the measure of their compensation, to a per centum on those debts. •The only restriction on the discretion of the board was, that whatever compensation it allowed should be contingent, and paid in the debts and liens secured by the proceedings. The fixing the counsel’s compensation was one thing, and the designating the means for its payment was another, and a very different thing. There is no limitation whatever on the powers and discretion of the board as to the mode of ascertaining the measure of the counsel’s compensation, whether by a per centum on the debts due the State which were secured, or upon them and the liabilities of the State *for the debts due from the company to others, from which she was relieved. For the accomplishment of both, the services required were one and the same, and the benefits to the State, as we have seen, were at least no greater in the former than in the latter; and it was right that the compensation should be measured by a per centum on both. And we think that in allowing it, the board acted strictly within the limits of their powers and discretion.
Whether they allowed the counsel too much or not, is a different question. Whatever may be thought of that, it cannot affect -the question of power. The power may *455 be clear, and unquestionable, though its exercise may be injudicious. The board, we think, undoubtedly had the power to determine, with the consent of the counsel, what their compensation should be. In this respect the only restrictions upon them, were those which we have mentioned, and which were complied with in the contract.
The compensation which the counsel received does seem, at first sight, to be so dis-proportioned to the amount which they paid over to the State, that without knowing, or considering the whole case, objection to it naturally arises in the mind. We do not like the idea of th.e State getting so little of what was justly due her from the canal company, and her counsel getting so much the larger proportion of what was recovered. And men are often too ready to condemn in such a case, without giving due weight to the facts and circumstances which should be considered in the formation of a just opinion. In this case it ought to be remembered and considered, that whilst the State surrendered to the counsel, through the board of public works, in consideration of their services, a large portion of her debt, justly due from the canal company, the debt, under the circumstances then existing, was *of little value, and it was to obtain the efficient services of able counsel, to relieve her from heavy liabilities then impending, which was of vastly more importance to her than the debts of such inconsiderable value, which were then dtie her, in which her counsel were to be paid.
The services rendered by the counsel, were, beyond all question, of a very extraordinary and arduous character. The usual limit of an opinion will not allow us to detail them. In the language of a distinguished witness in the cause, who was well informed on the subject, and which we think is corroborated by the other evidence, “they were not merely for the enforcement^ of legal rights, but the control of political influences of great and important _ character, all of which was to be done attheir own expense, and their reward or compensation to be only in the evidences of debt of the canal itself, the value of which at that time was little or nothing.” The policy of a sovereign State, which had the absolute control of the administration and management of a great work of internal improvement, which had been persisted in for a period of seventeen years, had to be overturned. In the accomplishment of which, opposition from the dominant political power in possession, and strong local prejudices and interests had to be encountered.
It is argued by the appellant’s counsel, that, the legislature of an enlightened State, as Maryland is claimed, and conceded to be. it may be presumed, will not pursue a line of policy adverse to the welfare of the State— and that the services of the Virginia counsel were not necessáry to effectuate a change of policy in the administration of the canal, which was so obviously for the benefit of the State, as well as the other creditors. And yet it is shown by this record that a line of policy had been pursued by Maryland for seventeen *years, which had proved disastrous to the canal and its creditors, and that it was persisted in. until the public mind had been enlightened, and some of the leading minds of the State were drawn to the subject, and were convinced of the importance and necessity of a change of policy: and this, we think, the record shows, was mainly through the active agency of the Virginia counsel. An enlightened State may pursue a course of policy for a long time, under political or other influences, which is injurious to her own interests. This was the case with Maryland, her own governor being the witness. In 1870 Governor Bowie, in a special communication to the general assembly of the State on this subject. after portraying the disastrous policy which had been pursued in the administration of the Chesapeake and Ohio canal, says to the general assembly, that “For this condition of affairs the State is to a great extent, justly responsible.”
Yet notwithstanding the extraordinary character of the undertaking of the counsel, which is characterized b,y the witness before cited, as so complicated and difficult an undertaking, “that very few counsellors or attorneys possessed the legal and political qualifications, or pecuniary resources necessary to carry it out,” and although it was conducted by them with great skill, ability, zeal and energy, at their own expense, during' a period of five or six years of almost incessant labors, the compensation they received was a rich and ample reward. And this — the extent of the reward realized by them — may account for the persistent effort that has been made, first in the legislature, then by the press, again in the legislature, and then in the courts, to assail these transactions, and to set aside the contracts. But it should be borne in mind, that if the counsel had failed of success, they would have received *nothing. after having carried on such a warfare for the State, at their own charge.
To say that the Slate received so small a portion of her debt, does notjpresentthe case in its true light. They paid the State $83,-000, in money, which was vastly more than her whole debt recovered, would have brought in market, when it was placed under their management; with which sum under the operation of the sinking fund, the State extinguished more than $300,000 of her indebtedness. They relieved file State of her liability for $300,000 of repair bonds, which she had guaranteed, and of the interest on them, amounting to more than the principal, by securing the payment thereof. And they gave effect to the Kens to secure the const ruction bonds, so as substantially, we think, to relieve the State from loss, by reason of her guarantee of $300.000 of those bonds, and the past due coupons on them which had not been paid, and those which were accruing and yet to mature, amounting-to largely more than the principal. Such was at least conceded by the board of public works in their final settlement with them. And such was the unanimous conclusion of the joint com *456 mittee of the general assembly, who had the whole matter under investigation; and that the contract was advantageous to the State, and had been faithfully fulfilled. And such was the conclusion of a majority of the committee subsequently appointed by the house of delegates.
At the time these contracts were entered into, such was the condition of the State’s claims against the Chesapeake and Ohio canal company, and of her liabilities for said company, that if suit had been brought soon after the contracts were made to set them aside, we are constrained to believe that it could not have been maintained in any court of justice. It would then have most probably, been universally regarded as *a good contract for 'the Commonwealth. And this is most probably the reason that no objection was made to it by any member of the assembly then in session, by whom the joint' resolution in question was passed, to whom the existence of the contract was doubtless known, or by any member of the subsequent general assemblies, which were annually in session, whilst the contracts were being performed.And if that be so — if a suit could not have been maintained to set aside these contracts, before the counsel had seriously entered upon their performance, can it be conceived, that now, after the services have been rendered, and the contract has been - performed by the counsel, and they have received their compensation, and have had a final settlement with the board, and no objection made to the contracts during the entire period of their performance, which was rendered with the knowledge of the State, and she has received the benefit, of those services, a suit brought five years after the final settlement of the whole matter to set aside the contracts, upon grounds which if they have any existence at all. existed in the same manner, and precisely to the same extent, before the performance of the contracts were entered upon, could be maintained? If A enters into a contract with the agent of B to perform a certain work, and he goes on and performs the work, B knowing of the contract and that he is engaged in its performance, and lays by. making no objection until the work is done, and the contract performed, he will not be entertained by a court of equity to set it aside, upon the ground that the consideration paid by his agent was excessive, or that he' exceeded his authority.
But in this case the per centum which the counsel was to receive, was payable in the debts of the canal company itself, which were of so little value at the time, that it was a very inadequate compensation for *their difficult and intricate undertaking, and doubtless would never have been assented to by them, but from the hope that by their exertions iirthe execution of the contract, they would be able to infuse value into those debts which they were to recover for the State, and out of which they were to be paid. They did succeed; and the bonds of the canal company, in which they were to receive payment for their services, which before they entered into the contract, were not worth more than ten or fifteen cents in the dollar, would about the time they completed the contract, command in market their par, or more than par value. It was in this way their compensation became munificent. It was the result of their success in the execution of their contract with the board. We do not believe that the halls of legislature, or the courts of justice, would ever have been made the arena of this contention but for the appreciation of the value of the debts of the canal, out of which the counsel were paid.
But a complete and sufficient answer to all this is, that they rendered the services, and received compensation therefor, pursuant to the contract they made with the board of public works, which it was invested.with power and authority to make. What we have said with reference to the services and compensation of the counsel, was designed to show, that the transaction was not liable to much of the criticism to which it has been subjected, and that no want of fairness, or good faith, in either of the parties to it, can justly be predicated of it; and not to vindicate its wisdom, with which we have nothing to do. With us the question is as to the power of the board to enter into the contracts, under the act of the legislature. And its power over the subject being plenary, the wisdom of its action cannot be reviewed by the courts. Such contracts if *bona fide made and entered into, are binding on the State.
There is a general charge in the bill of fraud, which is repelled by the answer, and positively denied. The bill makes no specifications, upon which the defendants could vindicate themselves against so grave a charge. All that it alleges in support of the charge is vague and indefinite, and wholly insufficient, we think, to support it. We have searched this record in vain, for any evidence of fraud. On the contrary, we think, it appears from the record, that all the parties to this transaction, in making the contracts, and in their execution, acted fairly, and in good faith, and that the evidence fails to establish the allegation of fraud. Upon the whole we are of opinion that there is no error in the decree of the court dismissing the plaintiff’s bill, and are of opinion to affirm the same. The decree must be affirmed.
Having reviewed the case and decided it upon its merits, we deem it unnecessary to consider the question raised by the demurrer, and the answer of Bradley T. Johnson, in which he invokes a decision upon the merits, as to the power of the house of delegates to direct the institution of this suit.
I am authorized by Judge Burks, to say, that he concurs in the affirmance of the decree dismissing the plaintiff’s bill. He has no doubt that he would concur in the opinion just read, but not having heard it, he. cannot of course express a concurrence in it.
Decree affirmed.